T.C. Memo. 1996-337


UNITED STATES TAX COURT


PARKER-HANNIFIN CORPORATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22121-93.                    Filed July 24, 1996.

William R. Stewart, Kent L. Mann, Karen E. Rubin, Stephen F.

Gladstone, and Dena M. Kobasic, for petitioner.

Elsie Hall, Randall P. Andreozzi, and Katherine L.

Wambsgans, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Chief Judge</u>:  Respondent determined a deficiency of

$15,007,108 in petitioner's 1987 Federal income tax.  Unless

otherwise indicated, all section references are to the Internal

Revenue Code in effect for the year in issue, and all Rule

references are to the Tax Court Rules of Practice and Procedure. The use of the term "reserve" in this opinion is for convenience and is not conclusive as to characterization for tax purposes.

After a concession by respondent, the issue for decision is whether and to what extent, if any, Parker-Hannifin Corporation may deduct $32,498,684 in contributions it made to a welfare benefit trust on June 30, 1987.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated herein by this reference.[1] At the time the petition in this case was filed, Parker-Hannifin Corporation had its principal place of business in Cleveland, Ohio.

Petitioner is an accrual basis taxpayer and files its Federal income tax return on a fiscal year ending June 30. Petitioner filed timely its Form 1120, U.S. Corporation Income Tax Return, and an associated amended return, Form 1120X, for its taxable year ended June 30, 1987, with the Internal Revenue Service Center at Cincinnati, Ohio.

Petitioner and its subsidiaries are engaged in, among other things, the design, manufacture, and marketing of components and systems for builders and users of durable goods, including

---

[1]The stipulation contained objections to many documents offered by respondent, and those objections were sustained during trial. Nonetheless, respondent proposed findings and presented arguments as if those documents were in evidence. Such conduct makes our task more difficult and respondent's brief less reliable.

products controlling motion, flow, and pressure. On June 30, 1987, petitioner had approximately 28,708 employees, of whom approximately 1,854 were represented by unions.

On June 30, 1987, petitioner established the Parker-Hannifin Employees Welfare Benefit Trust (the VEBA Trust) with Ameritrust Company National Association (Ameritrust) as trustee. The VEBA Trust was to serve as the funding medium for certain employee welfare benefit plans that petitioner intended to make up a Voluntary Employees' Beneficiary Association (VEBA). Petitioner established the VEBA Trust pursuant to the terms of the Trust Agreement Creating the Parker-Hannifin Corporation Voluntary Employees' Beneficiary Association (Trust Agreement).

The VEBA Trust was created to provide "health care, disability, life, and other welfare benefits under the Plans to Members, Dependents, and Beneficiaries, other than post-retirement health care and life benefits for 'key employees,' as that term is defined in Section 416(i) of the Code." Under the terms of the Trust Agreement:

> The Corporation [petitioner intended] to make contributions, on a sound actuarial basis, to the Trustee, on or before the last day of the Corporation's fiscal year, in such amounts as determined to be necessary to provide benefits required under the Plans. The Corporation's determination of such contributions shall be final and conclusive upon all persons. * * *

The Trust Agreement also provided that "Notwithstanding any provision of this Agreement to the contrary, in no event shall the Corporation be required to continue to fund benefits under any Plan through the Trust." Contributions to the VEBA Trust

were irrevocable and could not revert to petitioner under the terms of the Trust Agreement.

The VEBA Trust uses the cash method of accounting and has a fiscal year ending June 30. The VEBA Trust qualifies as a welfare benefit fund under section 419(e). The Parker-Hannifin Group Insurance Plan and the Long-Term Disability Plan for Salaried Employees of Parker-Hannifin Corporation were funded by the VEBA Trust.

Pursuant to an administrative services agreement dated February 24, 1981, Provident Life and Accident Insurance Company (Provident) agreed to provide administrative services for certain of petitioner's employee benefits. Provident continued to provide such services during the year in issue.

On June 30, 1987, petitioner contributed $42 million (the 1987 contribution) to the VEBA Trust. Effective July 1, 1987, the maximum Federal corporate income tax rate decreased from 46 to 34 percent. Petitioner's 1987 contribution to the VEBA trust included the following amounts:

| | |
|---|---|
| Incurred but unpaid medical, dental, & short-term disability benefits | [1]$9,022,227 |
| Administration fees | [2]479,089 |
| Long-term disability benefits | 2,500,000 |
| Union medical benefits | 3,210,991 |
| Postretirement benefits | |
|     Retirees | 10,779,650 |
|     Active employees | 16,133,508 |
|   Total | [3]$42,125,465 |

[1]Respondent has allowed a deduction for this amount.
[2]Respondent has allowed a deduction for this amount.
[3]Petitioner's chief financial officer suggested rounding the 1987 contribution to $42 million.

The person primarily responsible for the implementation and funding of the VEBA Trust was Joseph B. Dorn (Dorn). Dorn was director of taxation for petitioner on June 30, 1987. Dorn computed the VEBA contribution and claimed deduction on a single sheet of paper. Dorn is not an actuary.

The explanation of the calculation of each portion of the 1987 contribution follows below.

Incurred But Unpaid Medical, Dental, and Short-Term Disability Benefits

Dorn contacted Provident to obtain an estimate of the reserve for medical, dental, life, and short-term disability expenses incurred but unpaid before June 30, 1987. Provident provided Dorn with the amount of $9,022,227.

Expenses incurred but unpaid before June 30, 1987, for employees covered under collective bargaining agreements were included in the $9,022,227. Expenses estimated to be incurred but unpaid after June 30, 1987, for employees covered under a collective bargaining agreement were included in the $3,210,000 contribution for union medical benefits.

Petitioner's 1987 contribution included $9,022,227 for incurred but unpaid medical, dental, and short-term disability benefits.

Postretirement Benefits--Retirees

Reserve Computation

Dorn obtained the actual fiscal 1987 expenses incurred through April 1987 for benefits paid to hourly and salaried

retired employees.  Dorn annualized this number to take into account the remainder of fiscal 1987 and arrived at expenses of $2,093,462.  Dorn then subtracted employee contributions of $547,110 and $6,402 related to key employees.  (Plans covering key employees must be funded separately.  See sec. 419A(d).)  The result of the above calculations was $1,539,950.  At this point, Dorn consulted with Harry A. Don (Don), an actuary with the Wyatt Company.  During a telephone conversation, Don told Dorn that the use of a factor of 7 would be appropriate.  Dorn multiplied $1,539,950 by 7 and arrived at $10,779,650, which was used in calculating the 1987 contribution.

### Actual Expenditures

For its 1987, 1988, and 1989 fiscal years, petitioner's financial statements reported expenses for retiree health care and life insurance benefits of $2,575,000, $2,494,000, and $2,899,000, respectively.  The following amounts were paid by Provident, on behalf of the VEBA Trust, for postretirement benefits and administrative expenses for retired employees:

| Year Ended | Amount[1] |
|------------|-----------|
| June 30, 1988 | $2,607,511 |
| June 30, 1989 | [2]3,069,240 |
| June 30, 1990 | 3,528,896 |
| June 30, 1991 | 4,275,589 |

[1]Because the VEBA Trust reimbursed Provident for these payments, there is a slight timing difference resulting from these disbursements.

[2]Expenses for July and August 1988 totaled $412,467.

Postretirement Benefits--Active Employees

### Reserve Calculation

To calculate the postretirement reserve amount for active employees, Dorn started with the $10,779,650 that he calculated for retirees. He then divided by the number of current retired employees (1,163) to get a cost per employee. Dorn once again consulted with Don by telephone to ask for a factor to determine the cost for covered active employees. Don told him to divide the cost per retired employee by 10. Dorn followed Don's direction and arrived at $927. He then multiplied $927 by the number of active employees (not including key employees), resulting in $16,133,508. This amount was used in calculating the 1987 contribution.

Medical Benefits for Union Members

### Reserve Computation

Petitioner's benefits department supplied Dorn with the fiscal 1987 expenses through April 1987 for short-term disability and medical, dental, and life insurance benefits paid under collective bargaining agreements. Dorn looked at all of the collective bargaining agreements in effect and determined the remaining length of each contract after June 30, 1987. He then annualized the expense amounts that were given to him by the benefits department. This amount was then multiplied by the remaining length of each contract to arrive at $3,210,991.

None of petitioner's collective bargaining agreements required use of a welfare benefit fund or prefunding of the negotiated benefits.  Petitioner's 1987 contribution included $3,210,991 for union medical benefits estimated to be incurred but unpaid after June 30, 1987.

Actual Expenditures

The following amounts were paid by Provident, on behalf of the VEBA Trust, for medical, short-term disability, dental and life benefits, and administrative fees for employees covered by collective bargaining agreements:

| Year Ended | Amount[1] |
|------------|-----------|
| June 30, 1988 | $2,881,637 |
| June 30, 1989 | 3,869,076 |
| June 30, 1990 | 5,728,512 |
| June 30, 1991 | 4,189,156 |

[1]These amounts include payments made relative to contracts not in force on June 30, 1987.  Also, because the VEBA Trust reimbursed Provident for these payments, there is a slight timing difference resulting from these disbursements.

During fiscal 1988, 1989, and 1990, Provident, on behalf of the VEBA Trust, paid the following amounts for medical, short-term disability, dental and life benefits, and administrative fees for employees covered by collective bargaining agreements in effect on June 30, 1987:

| Year Ended | Amount[1] |
|---|---|
| June 30, 1988 | $2,474,363 |
| June 30, 1989 | 797,211 |
| June 30, 1990 | 243,086 |
| Total | $3,514,660 |

[1]These amounts have been rounded to the nearest whole dollar.  Also, because the VEBA Trust reimbursed Provident for these payments, there is a slight timing difference resulting from these disbursements.

Petitioner commingled its $3,210,991 VEBA contribution for union medical benefits with all other VEBA assets.

Long-Term Disability

Reserve Computation

William H. Mercer (Mercer) was an employee benefit compensation and actuarial consulting firm.  In 1986, petitioner asked Terrence McManamon (McManamon), a principal with the Cleveland office of Mercer, to perform calculations to quantify the disabled life reserve for long-term disability coverage for salaried and nonunion hourly employees.  Using source information from petitioner, McManamon was able to determine the net monthly and annual benefits payable to petitioner's then currently disabled employees.  McManamon then took into account offsets for Social Security and workers' compensation and offsets received by any other employer-sponsored program or State disability programs.  McManamon's calculations assumed that all currently disabled employees included in the calculation would continue to receive benefits until age 65.  The calculation did not take into

account employees who might recover from their disability or die in the interim and stop receiving payments.

Petitioner's benefits department forwarded the fiscal 1986 reserve amount that was calculated by Mercer to Dorn. After Dorn reviewed how employees went on and came off long-term disability, which he felt was infrequently, Dorn determined that the 1986 reserve adjusted by some factor would be acceptable as a 1987 reserve. Dorn increased the reserve by 6 percent and arrived at $2.5 million. Mercer confirmed that 6 percent was a conservative factor to use in the adjustment. Dorn used the $2.5 million that he calculated for long-term disability reserves in calculating the 1987 contribution.

Actual Expenditures

The cost of benefits and administrative fees actually paid by Provident, on behalf of petitioner, for long-term disability claims of its employees during its 1986 year was $338,486. The cost of benefits and administrative fees actually paid by Provident, on behalf of petitioner, for long-term disability claims of its employees during its 1987 year was $442,198. The amount of long-term disability benefits and administrative fees actually paid by Provident, on behalf of the VEBA Trust, through August 31, 1988, with respect to employees who were disabled as of June 30, 1987, was $487,651. The VEBA Trust reimbursed Provident for such payments, and, thus, there is a slight timing difference.

The following amounts of long-term disability benefits and administrative fees were paid by Provident, on behalf of the VEBA Trust:

| Year Ended | Amount[1] |
|---|---|
| June 30, 1988 | $ 529,543 |
| June 30, 1989 | 574,034 |
| June 30, 1990 | 694,697 |
| June 30, 1991 | 739,874 |
| June 30, 1992 | 871,953 |
| June 30, 1993 | 926,162 |
| June 30, 1994 | 1,158,574 |

[1]Because the VEBA Trust reimbursed Provident for these payments, there is a slight timing difference resulting from these disbursements.

Petitioner's long-term disability plan required any disability payments payable by petitioner to be offset by any amounts received by claimants from Social Security or other listed third-party sources.

In a July 2, 1987, letter to Adrian V. Wallace, vice president of Ameritrust, petitioner's treasurer, W.C. Young, stated:

Disbursements from this Trust will take the form of wire transfers to the Provident Insurance Company on Wednesday of each week and will run between $500,000 and $1,000,000 per transfer. Based on such a schedule it is anticipated that the $42,000,000 deposited in the Trust will be paid out within 12 to 18 months. * * *

Beginning in September 1987, petitioner deposited into the VEBA Trust amounts withheld from its employees for their share of the cost of providing the covered benefits. The VEBA Trust used its assets, consisting solely of the 1987 contribution, employee

contributions, and interest income, to pay the current cost of providing benefits to petitioner's employees and retirees as benefits came due during fiscal 1988 and the first 2 months of fiscal 1989.  Beginning in August 1988, the VEBA Trust used its assets, consisting solely of amounts that were currently contributed and currently deducted by petitioner along with employee contributions, to pay the current cost of providing benefits to petitioner's employees and retirees as benefits became due.

The following table reflects the deposits, earnings, and withdrawals affecting the VEBA Trust for fiscal 1987, 1988, 1989, and 1990:

|  | Fiscal Years | | | |
|  | 1987 | 1988 | 1989 | 1990 |
| Employer contributions | $42,000,000.00 | -0- | [1]$40,737,374.59 | [2]$50,783,404.03 |
| Employee contributions | -0- | $ 1,555,626.86 | 1,841,554.51 | 2,505,955.35 |
| Interest earned | [3]773.98 | 1,749,030.80 | 78,641.10 | -0- |
| Benefits paid | -0- | 39,153,640.83 | 48,808,587.03 | 53,289,359.38 |
| Ending balance | 42,000,773.98 | 6,151,016.83 | -0- | -0- |

[1]Represents the total of petitioner's monthly contributions to the VEBA Trust.
[2]Represents the total of petitioner's monthly contributions to the VEBA Trust.
[3]The amounts to which the parties have stipulated in later years ignore this amount.

In August 1988, petitioner filed Form 1024, Application for Recognition of Exemption, for the VEBA.  Unaudited financial statement information for petitioner's 1988 year that was included with the application indicated that, on June 30, 1988, the VEBA Trust had a balance of $6,378,125.82.  Benefits paid were shown as $42,450,649.30.  The only contributions to the VEBA Trust were those from employees and from investment income.

Petitioner received a determination letter from the District Director of the Internal Revenue Service on November 29, 1988, stating that the application for recognition of exemption under section 501(c)(9) had been approved. The determination letter states: "No opinion is expressed or implied as to whether employer contributions to * * * [the VEBA Trust] are deductible under the Code."

Petitioner did not generate a contemporaneous census of its employees for whom benefits were to be provided through the VEBA Trust. Such a census would have included the date of birth, gender, family coverage, and date of hire for each employee for purposes of funding the VEBA in petitioner's 1987 fiscal year.

Petitioner reflected $33.6 million of the 1987 contribution on its balance sheet as a "prepaid expense" under the category of current assets and $8.4 million of the 1987 contribution on its balance sheet as an "other asset".

The Financial Accounting Standards Board Statement No. 81 relating to "Disclosure of Postretirement Health Care and Life Insurance Benefits" (FASB 81) was in effect during the years in issue. FASB 81 required that, at a minimum, the following information be disclosed: (1) A description of the benefits provided and the employee groups covered; (2) a description of the accounting and funding policies followed for those benefits; (3) the cost of those benefits recognized for the period, unless the provisions of paragraph 7 apply; and (4) the effect of

significant matters affecting the comparability of the costs

recognized for all periods presented.  FASB 81 provided several

illustrative disclosures, including the following to be used

where benefits are annually funded based on estimated accruals:

> In addition to providing pension benefits, the company and its subsidiaries provide certain health care and life insurance benefits for retired employees. Substantially all of the company's employees, including employees in foreign countries, may become eligible for those benefits if they reach normal retirement age while working for the company.  The estimated cost of such benefits is accrued over the working lives of those employees expected to qualify for such benefits as a level percentage of their payroll costs.  Accrued costs are funded annually and were $XXX for 19X4.

FASB 81 also provided the following illustrative disclosure

for use where benefit costs are expensed when paid:

> In addition to providing pension benefits, the company and its subsidiaries provide certain health care and life insurance benefits for retired employees. Substantially all of the company's employees, including employees in foreign countries, may become eligible for those benefits if they reach normal retirement age while working for the company.  The cost of retiree health care and life insurance benefits is recognized as expense as claims are paid.  For 19X4, those costs totaled $XXX.

Petitioner's 1987 financial statement stated the following

regarding its provision of health care and life insurance

benefits:

> In addition to providing pension benefits, the Company provides certain health care and life insurance benefits for retired employees.  Substantially all of the Company's employees may become eligible for those benefits if they become eligible for retirement while working for the Company.  The cost of retiree health care and life insurance benefits is recognized as expense as claims are paid.  * * *

Petitioner never notified any of the labor unions, or representatives thereof, that represented employees of petitioner or its subsidiaries of the existence of the VEBA Trust, petitioner's contribution to the VEBA Trust, or the existence of any reserves of the VEBA Trust. Petitioner never notified any of its employees or retirees of the existence of the VEBA Trust, petitioner's 1987 contribution to the VEBA Trust, or the existence of any reserves of the VEBA Trust, except for petitioner's employees who were involved in the implementation of the VEBA Trust. Petitioner never disclosed the existence of the VEBA Trust or any reserves of the VEBA Trust on any of the summary plan descriptions provided by petitioner to its employees to notify them of its pension and retirement plans.

Petitioner made no specific disclosure to its shareholders or the public that it prefunded the VEBA Trust. Petitioner disclosed to its shareholders and to the public the prefunding of certain future employee benefits under the heading "Other" in petitioner's Annual Reports for 1987, 1988, and 1989. The explanation of "Other" in petitioner's 1987 Annual Report stated:

> Other increases in assets included an increase in
> "Prepaid expenses" and "Investment in joint ventures
> and other assets" as a result of prefunding certain
> future employee benefits. "Excess cost of investments"
> increased primarily as a result of the acquisition of
> United Aircraft Products, Inc.

On its Form 1120 for 1987, petitioner deducted the full amount of the 1987 contribution to the VEBA Trust. Petitioner also claimed a deduction on its 1987 return for the actual cost

of providing employee medical and life insurance, long-term disability benefits, and union medical benefits during 1987.

In the notice of deficiency, respondent allowed petitioner partial deductions in the amount of $9,022,227 for incurred but unpaid medical, dental, and short-term disability benefits and $353,624 for administrative expenses, none of which are at issue in this case. Respondent has conceded that petitioner is entitled to a deduction in the amount of $125,465 for additional administrative expenses. The amount of the 1987 contribution remaining in dispute is $32,498,684.

## OPINION

Section 419 limits the deduction for contributions paid or accrued by an employer to a welfare benefit fund to the "qualified cost" for the taxable year. Sec. 419(b). "Qualified cost" includes the qualified direct cost for the taxable year and any addition to a qualified asset account for the taxable year, subject to the section 419A(b) limitation. Sec. 419(c)(1). Section 419A provides rules governing additions to the qualified asset account. "Qualified asset account" is defined as "any account consisting of assets set aside to provide for the payment of (1) disability benefits, (2) medical benefits, (3) SUB [supplemental unemployment compensation benefit] or severance pay benefits, or (4) life insurance benefits." Sec. 419A(a). Additions to the qualified asset account are constrained by the account limit, as defined by section 419A(c). Sec. 419A(b).

The legislative history of section 419A states the following:

> Limitations on qualified asset account.--The conference agreement includes substantial modifications to the provisions setting forth the limitation on additions to a qualified asset account. Such an account consists of assets set aside for the payment of disability benefits, medical benefits, supplemental unemployment or severance pay benefits, and life insurance or death benefits.
>
> In general, the account limit is the amount estimated to be necessary under actuarial assumptions that are reasonable in the aggregate, to fund the liabilities of the plan for the amount of claims incurred but unpaid, for benefits described in the previous paragraph and administrative costs of such benefits, as of the close of the taxable year. Claims are incurred only when an event entitling the employee to benefits, such as a medical expense, a separation, a disability, or a death actually occurs. The allowable reserve includes amounts for claims estimated to have been incurred but which have not yet been reported, as well as those claims which have been reported but have not yet been paid. * * * [H. Conf. Rept. 98-861, at 1155-1156 (1984), 1984-3 C.B. (Vol. 2) 1, 409-410.]

Relevant to our determination herein, the account limit includes: (1) The "amount reasonably and actuarially necessary to fund" certain claims incurred but unpaid and the related administrative costs, sec. 419A(c)(1); and (2) an additional "reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary" for postretirement medical and life insurance benefits, sec. 419A(c)(2). No account limit applies to any qualified asset account for a separate welfare benefit fund maintained pursuant to a collective bargaining agreement. Sec. 419A(f)(5)(A); sec.

1.419A-2T, Temporary Income Tax Regs., 50 Fed. Reg. 27428 (July 3, 1985).

Postretirement Benefits

Section 419A(c)(2) provides for an additional reserve for postretirement medical and life insurance benefits:

> (2) Additional reserve for post-retirement medical and life insurance benefits.--The account limit for any taxable year may include a reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for--
>
> > (A) post-retirement medical benefits to be provided to covered employees (determined on the basis of current medical costs), or
> >
> > (B) post-retirement life insurance benefits to be provided to covered employees.

Petitioner included $10,779,650 in its 1987 contribution for postretirement benefits for retirees. The 1987 contribution included $16,133,508 for postretirement benefits for active employees. Respondent disallowed the deduction of these contributions on petitioner's fiscal 1987 Federal income tax return.

Petitioner argues that section 419A(c)(2) allows a reserve funded over the working lives of covered employees for postretirement benefits to be included in the account limit without requiring that specific assets be set aside or that a separate account be created. Petitioner contends that the

"account limit" under section 419A(c) is only a mathematical computation that limits the deduction, not a requirement that a segregated reserve be included in the welfare benefit fund.

However, the VEBA Trust did not retain even general assets that were sufficient to fund the reserves claimed by petitioner. Thus, petitioner's position has the same shortcomings as the position that the Court considered and rejected in General Signal Corp. & Subs. v. Commissioner, 103 T.C. 216 (1994). In General Signal, the taxpayer corporation argued that section 419A(c)(2) did not require the establishment of a funded reserve in order for an amount to be included in the account limit. Id. at 240. Because of the taxpayer corporation's "vehement assertion" that "reserve funded" did not have a commonly understood meaning, the Court looked to the legislative history of section 419A(c)(2) for guidance and determined "that Congress intended section 419A(c)(2) to permit the accumulation of funds for purposes of funding postretirement benefits." Id.

The legislative history of section 419A states, in part:

> Prefunding of life insurance, death benefits, or medical benefits for retirees.--The qualified asset account limits allow amounts reasonably necessary to accumulate reserves under a welfare benefit plan so that the medical benefit or life insurance (including death benefit) payable to a retired employee during retirement is fully funded upon retirement. These amounts may be accumulated no more rapidly than on a level basis over the working life of the employee, with the employer of each employee. * * * The conferees intend that the Treasury Department prescribe rules requiring that the funding of retiree benefits be based on reasonable and consistently applied actuarial cost methods, which take into account experience gains and

> losses, changes in assumptions, and other similar
> items, and be no more rapid than on a level basis over
> the remaining working lifetimes of the current
> participants (reduced on the basis of reasonable
> turnover and mortality assumptions).  [H. Conf. Rept.
> 98-861, <u>supra</u> at 1157, 1984-3 C.B. (Vol. 2) at 411;
> emphasis added.]

The legislative history of section 419A thus indicates that an accumulation of assets, not just a calculation, is intended in a qualified asset account.  See also <u>National Presto Indus., Inc. v. Commissioner</u>, 104 T.C. 559, 569-574 (1995).

Petitioner made no disclosure of the establishment of reserves for postretirement benefits in its financial reporting for its 1987 year.  Only those employees involved in the implementation of the VEBA were informed about the existence of the VEBA.

A letter signed by petitioner's treasurer states that the 1987 contribution was expected to be depleted by benefit payments over the 12 to 18 months following the creation of the VEBA.  By the second month of petitioner's 1989 year, the 1987 contribution had been depleted.  Petitioner made no contribution during its 1988 year, and, in the following years, petitioner contributed to the VEBA through monthly contributions approximating the benefits paid.  The ending balance of the VEBA for each of the years 1989 and 1990 was zero.  Petitioner's Form 1024, Application for Recognition of Exemption, did not indicate the establishment of reserves.  While disclosure is not required by the applicable Code and regulations, the lack of disclosure, along with

petitioner's other actions regarding the VEBA Trust, shows that petitioner did not accumulate assets in the VEBA Trust for the purpose of funding a reserve for postretirement benefits.  See General Signal Corp. & Subs. v. Commissioner, supra at 239.

In General Signal, the Court acknowledged that there was no requirement of a separate account.  Petitioner argues that the suggestion that money must be maintained in a fund in at least the amount of the deduction is inconsistent with the Court's position in General Signal.  There is no such inconsistency.  In General Signal, the Court stated:

> With respect to petitioner's argument that respondent's interpretation of section 419A(c)(2) would require a separate accounting requirement, respondent contends that it is sufficient that the reserve required by section 419A(c)(2) be funded with general rather than specific assets.  This interpretation appears consistent with legislative intent and requires only that the overall balance maintained in the VEBA be sufficient to support the postretirement reserve.  It does not appear to require that a separate account be established with respect to the reserve.  [Id. at 246.]

An interpretation of section 419A(c) that requires such a reserve to be established, petitioner argues, could prevent the fund from paying current benefits because the reserves would be required to be maintained.  Petitioner also believes that such an interpretation would also result in the imposition of minimum funding as is required under section 412 for qualified plans. Petitioner further argues that "funded over the working lives" describes the manner in which the reserves are to be computed and

does not require separate funding or funding over the actual working lives of the covered employees.

Petitioner also argues that respondent cannot add requirements to section 419A(c)(2) when respondent has failed to prescribe regulations as required by section 419A(i). Petitioner contends that it took steps to determine the reasonable and necessary amount it could deduct as a contribution based on the guidance provided by the Code.

These remaining arguments relate to the amount of funding and the level of funding of the VEBA Trust. Because petitioner failed to meet the minimum requirement of establishing a reserve funded over the working lives of the covered employees, we do not reach the question of the actuarial correctness of the 1987 contributions and do not discuss the parties' expert testimony relating to that issue.

Petitioner's situation is not distinguishable from that of the taxpayer in General Signal. We decline petitioner's invitation to reconsider General Signal. Therefore, respondent's determination that the contribution for postretirement benefits is not deductible will be sustained.

Medical Benefits for Union Members

No account limit applies in the case of a qualified asset account under a separate welfare benefit fund under a collective bargaining agreement. Sec. 419A(f)(5)(A). Prior law called for the Treasury Department to issue regulations to establish special

reserve limit principles for collectively bargained plans. Before final regulations were issued, current section 419A(f)(5)(A) was enacted, eliminating the need for such regulations. See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1851(a)(13), 100 Stat. 2862.

Respondent argues that petitioner should not be allowed to deduct the portion of the contribution related to collectively bargained employees because a separate fund was not created. This argument arises out of the language of section 419A(f)(5) that refers to any "qualified asset account under a <u>separate welfare benefit fund</u> * * * under a collective bargaining agreement". Emphasis added. Respondent's position is that "separate" means distinct and different from welfare benefits for noncollectively bargained employees. Because petitioner commingled the assets that were contributed for collectively bargained employees with those for noncollectively bargained employees, respondent argues that petitioner should not be allowed to deduct the portion of the 1987 contribution for union medical benefits.

Petitioner asserts that the use of "separate" means that the funds in the VEBA should be separate from the general assets of petitioner and beyond the reach of petitioner's creditors. Under the terms of the VEBA Trust, such reversion of petitioner's contributions was expressly prohibited.

On June 30, 1987, petitioner had 28,708 employees, of whom approximately 1,854, or 6.46 percent, were represented by unions. The plan was not the result of collective bargaining or required by any agreement with the union. Petitioner attempts to distinguish between the union and nonunion contributions under the VEBA by calculating the respective contributions in isolation. The plan itself, however, does not make that distinction and cannot as a whole reasonably be characterized as a welfare benefit fund maintained pursuant to a collective bargaining agreement.

Because the contribution for collectively bargained employees does not meet the requirements of section 419A(f)(5), the deductibility of the contribution for union medical benefits must be tested under section 419A(c)(1). The analysis of the treatment of the contribution for medical benefits to union members and of the contribution for long-term disability claims is combined below.

Medical Benefits for Union Members and Long-Term Disability Claims

In addition to the medical benefits for union members, petitioner included $2.5 million in the 1987 contribution for long-term disability claims. Petitioner alleges that the long-term disability claims were incurred but unpaid as of the close of its 1987 fiscal year.

Section 419A(c)(1) provides the account limit for claims described in section 419A(a), including disability benefits, sec.

419A(a)(1), and medical benefits, sec. 419A(a)(2), that are incurred but unpaid.  Section 419A(c)(1) provides:

> (1) In general.--Except as otherwise provided in this subsection, the account limit for any qualified asset account for any taxable year is the amount reasonably and actuarially necessary to fund--
>
>> (A) claims incurred but unpaid (as of the close of such taxable year) for benefits referred to in subsection (a), and
>>
>> (B) administrative costs with respect to such claims.

Petitioner asserts that, in General Signal Corp. & Subs. v. Commissioner, 103 T.C. 216 (1994), the inclusion of incurred but unpaid long-term disability claims and union medical benefits in the account limit was not an issue.  Petitioner argues that the subsequent history of claims supports Dorn's calculation of these portions of the 1987 contribution.

Petitioner's contribution for medical benefits for union members fails to meet the requirement of section 419A(c)(1) that it fund claims incurred but unpaid as of June 30, 1987.  By petitioner's own admission, the contribution for medical benefits for union members included expenses estimated to be incurred but unpaid after June 30, 1987.  Assuming, however, that this contribution had met the above requirement, the contribution would nonetheless be nondeductible for the reasons discussed below with respect to long-term disability benefits.

Under section 419A(a), "'qualified asset account' means any account consisting of assets set aside to provide for the payment of" certain benefits. In order to qualify as a deductible contribution to a welfare benefit fund under section 419(a), petitioner's contribution must not exceed the qualified cost of the fund, i.e., the qualified direct costs plus any qualified asset account. Qualified asset accounts are generally subject to an account limit, which for these purposes is the amount reasonably and actuarially necessary to fund claims incurred but unpaid as of the close of the taxable year in which the contribution is made, and the related administrative costs. For petitioner's 1987 year, no benefits were paid out of the VEBA Trust, and, thus, no qualified direct costs were incurred. Petitioner argues that the $2.5 million contribution for long-term disability is a qualified asset account and is deductible.

The parties disagree as to the meaning of the phrase "assets set aside" in the definition of qualified asset account. Petitioner contends that the phrase does not require that a "reserve" be established, pointing out that "reserve" is used only in the context of postretirement benefits in section 419A. Respondent argues that petitioner must actually set aside the assets to include them in the qualified asset account and to deduct the contribution.

Petitioner has pointed to several other provisions of the Code that require assets to be "set aside" as examples of language that Congress would have used if it had intended for the set-aside of assets. See secs. 419A(d)(1), 512(a)(3)(E). In an analogous context in General Signal Corp. & Subs. v. Commissioner, supra at 244, we stated:

> However, if the language of section 419A(c)(2) is read to require the creation of a reserve funded with general assets rather than segregated assets, the language of these other provisions would not have been appropriate. More importantly, this argument is simply not sufficient to overcome the unambiguous statements of the legislative history regarding the accumulation of assets and the funding of benefits.

The same analysis and conclusion apply here.

Although section 419A(c)(1) does not use the term "reserve", in order for a taxpayer to be entitled to a deduction, the assets must be set aside. An interpretation that the requirements of section 419A are purely computational would ignore the legislative history of section 419A, which states, in part:

> the conferees wish to emphasize that the principal purpose of this provision of the bill is to prevent employers from taking premature deductions, for expenses which have not yet been incurred, by interposing an intermediary organization which holds assets which are used to provide benefits to the employees of the employer. * * * [H. Conf. Rept. 98-861, at 1155 (1984), 1984-3 C.B. (Vol. 2) 1, 409 (1984).]

Petitioner has ignored this requirement and has focused instead on the reasonableness of the amount of the contribution for long-term disability.

As in the case of the postretirement benefits, petitioner did not disclose the establishment of reserves for long-term disability benefits in its financial reporting for its 1987 year. Only those employees involved in the implementation of the VEBA were informed about the existence of the VEBA. By making the contribution for long-term disability benefits, petitioner received a substantial tax savings. Petitioner's treasurer estimated in a July 1987 letter that the 1987 contribution would be depleted in 12 to 18 months after the VEBA was established. The 1987 contribution was depleted by the second month of petitioner's 1989 year. Petitioner made no contribution for long-term disability benefits that were incurred but unpaid during its 1988 year, and, in the following years, petitioner contributed to the VEBA through monthly contributions approximating the benefits that were paid. No indication of reserves was shown on petitioner's Form 1024, Application for Recognition of Exemption. Again, while disclosure is not required by the applicable Code and regulations, the lack of disclosure, along with petitioner's other actions regarding the VEBA Trust, shows that petitioner did not accumulate assets in the VEBA Trust for the purpose of setting aside assets for the payment of future long-term disability benefits that were incurred but unpaid.

We cannot conclude that these assets were set aside for the above-stated purposes, and, thus, we need not address the

reasonableness of the contributions and the related expert testimony.

To reflect the foregoing and a concession by respondent,

<u>Decision will be entered</u>

<u>under Rule 155</u>.